**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | |
|---|---|
| **RODERIC KNAPIK,** *Individually and as Executor of the Estate of Michael Charles Knapik, Deceased,* **ROBIN LYNN KNAPIK,** *Individually,*<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**UNITED STATES OF AMERICA,**<br><br>**Defendant.** | **CIVIL ACTION NO.**<br>**5:19-cv-00185-TES** |

**ORDER DENYING PLAINTIFFS' MOTION TO TRANSFER AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Michael Charles Knapik ("Mr. Knapik"), a Navy veteran, suffered from stage 4 cancer. He died August 25, 2015. During the two months preceding his death, Mr. Knapik underwent extensive medical testing related to his underlying cancer diagnosis, which is the subject of this action. In fact, Plaintiffs adamantly claim that the true subject of this action is the alleged failure on the part of treating physicians and medical staff at two Veterans Affairs medical centers to inform Mr. Knapik of his cancer diagnosis. Accordingly, Plaintiffs[1] brought this wrongful death action against the United States of America, via its agency, the Department of Veterans Affairs under the Federal Tort

---

[1] There are three Plaintiffs involved in this action: (1) the Estate of Michael Charles Knapik; (2) Mr. Knapik's son— Roderic Knapik; and (3) Mr. Knapik's daughter— Robin Lynn Knapik. As a procedural note, Roderic Knapik also serves as the Executor of the Estate.

Claims Act (the "FTCA"). After the Government filed its Motion for Summary Judgment [Doc. 15], Plaintiffs filed a Motion to Transfer [Doc. 34] the case to another district. For the reasons discussed below, the Court **DENIES** Plaintiffs' Motion to Transfer and **GRANTS** the Government's Motion for Summary Judgment.

## I.   PROCEDURAL MATTERS

### A.   <u>Motion to Transfer</u>

Before discussing the merits of the Government's Motion for Summary Judgment, the Court finds it necessary to first address Plaintiffs' Motion to Transfer this case to the Northern District of Georgia. [Doc. 34]. The Court can easily rule on this transfer motion without muddying the waters by wading into extensive factual background regarding the substantive facts surrounding Mr. Knapik's medical diagnostic testing and treatment at the VA.

However, in the interest of clarity, *some* background is necessary. To start, "motions to transfer are typically considered at an early stage in a case[.]" *Jones v. Walgreen Co.*, 463 F. Supp. 2d 267, 271 (D. Conn. 2006). Yet, Plaintiffs bring their transfer motion *seventeen months* after initiating this action. Discovery has closed and the opposing party has moved for summary judgment. At this point in the proceedings, the Court certainly did not expect to find itself ruling on a transfer motion, especially one filed by the parties that initially chose the Middle District as the appropriate venue to file suit.

2

However, by way of explanation, Plaintiffs claim their sudden interest in transfer

arises only "after response and reflection on the Court's Order to Show Cause[.]" [Doc.

34, p. 1]. Appropriately, it appears a brief background of that Order [Doc. 30] is

necessary to understand the context in which Plaintiffs' Motion to Transfer arises.

### 1.      Order to Show Cause

As noted earlier, the Government moved for summary judgment after the close

of discovery. In its Motion for Summary Judgment, the Government contended that all

claims arising in this action, despite how they were otherwise characterized by Plaintiffs

in their Complaint, were nonetheless classic medical malpractice claims. [Doc. 15-1, pp.

10–15]. And, this characterization is important, because the Government argued that

any plaintiff alleging medical malpractice under Georgia law must provide expert

testimony in support of such claims to survive summary judgment. [*Id.*]. Therefore,

because Plaintiffs failed to produce the requisite expert testimony, the Government

concluded that it was entitled to judgment as a matter of law on all such claims asserted

against it. [*Id.*].

As expected, Plaintiffs responded. *See generally* [Doc. 25]. However, quite

unexpectedly, Plaintiffs responded by arguing that the claims the Government labeled

as malpractice claims were really just garden-variety claims for ordinary negligence.

[*Id.*at pp. 2, 4]. The Government responded in turn, and this back-and-forth between the

parties as to how the Court should consider Plaintiffs' claims forced the Court to

consider the matter thoroughly.

First, the Court turned to Plaintiffs' Complaint, immediately noting the sparse detail[2] provided in support of the following claims/theories of liability: (1) negligence; (2) omission; (3) personal injury; (4) wrongful death; and (5) medical malpractice. [Doc. 1, pp. 2, 6]. Second, the Court reviewed the evidence proffered during the nine-month discovery period in support of these claims and noted areas in deposition testimony where even the plaintiffs appeared to not understand the full extent of their claims.[3]

---

[2] For example, Plaintiffs only bring a single count against the Government, but then allege four different theories of liability within it. [Doc. 1, ¶ 39]. Then, under this single count, Plaintiffs incorporate all 36 preceding paragraphs, and in one such paragraph, they also allege a claim for malpractice. [*Id.* at ¶¶ 24, 38]. Accordingly, Plaintiffs' Complaint— the filing that establishes the basis of this action—did not necessarily provide the clearest presentation of relevant facts or claims.

[3] During the deposition of Robin Lynn Knapik, the Government's counsel asked a serious of questions, seeking clarification as to the allegations contained in Plaintiffs' Complaint:

| Defense Counsel: | . . . I just want to make sure that we understand - - that we have, you know, a mutual understanding of whether or not we know that the VA had a diagnosis and didn't communicate it weeks earlier, or was it a matter of trying to figure out the diagnosis. Do you know? |
| Robin Lynn Knapik: | I couldn't tell you. |
| Defense Counsel: | Okay. |
| Robin Lynn Knapik: | I don't - -I don't know the answer to that. If they knew or they didn't know, or somebody knew and it didn't get passed down the chain, I don't - - I don't know. |

[Doc. 27, Robin Lynn Knapik Depo., p. 30:4–15].

| Defense Counsel: | [A]re you alleging that the VA's inaction or the things that they failed to do could have saved your dad's life or just could have extended his life? |
| Robin Lynn Knapik: | I - - I really don't - - you know, I can't answer that. I really can't answer that. On the short side, it could have extended his life in a way maybe he could have taken that trip to Alaska. You know, if he'd had a couple of more months, who how - - how a person's life could have been extended or not been extended. |

[Doc. 27, Robin Lynn Knapik Depo., pp. 31:19–32:4].

And while the Court could identify a generalized failure-to-inform claim, it wanted to ensure that it was truly ruling on that claim alone. Wrapped up in this analysis, the Court was also well-aware that certain claims alleged against the VA, those implicating judicial review of veterans' benefits, are barred by the Veterans' Judicial Review Act (the "VJRA"). 38 U.S.C. § 511(a).[4] Therefore, in an abundance of caution, the Court issued an Order to Show Cause, as to why subject-matter jurisdiction was appropriate in this action given the limitations imposed by the VJRA. *See generally* [Doc. 30].

In response, both parties assured the Court that it was not limited in any way by the VJRA so that the Court had the authority to rule on the underlying issue in this action—the failure-to-inform claim. [Doc. 32, p. 2 ("The District Court has subject-matter jurisdiction over the complaint under the FTCA, or Federal Tort Claims Act."); ("[This] case never triggers the VJRA or Veteran[s]' Judicial Review Act [38 U.S.C.] § 511.")]; [Doc. 39, p. 15 ("The parties are in accord that Plaintiffs' failure-to-inform claim does not call on this Court to make a VA benefits determination proscribed by the

---

[4] The Court, having previously discussed the Veterans Judicial Review Act (the "VJRA") in detail in its Order to Show Cause, will not repeat itself here. *See generally* [Doc. 30]. Rather, for purposes of ruling on this transfer motion, it is only necessary to state that, as a general matter, "[t]he VJRA's exclusive review procedure divests federal district courts of jurisdiction to hear challenges to benefits decisions and procedures of the Department of Veteran's Affairs." *Bracken v. United States*, No. 3:19-cv-982-J-34PDB, 2020 WL 3610810, at *4 (M.D. Fla. July 2, 2020) (citing *Milbauer v. United States.*, 587 F. App'x 587, 590 (11th Cir. 2014); *Cheves v. Dep't of Veterans' Affairs*, 227 F. Supp. 2d 1237, 1242 (M.D. Fla. 2002) (quotation omitted)). While the Court was satisfied that the VJRA would not necessarily preclude its review of a failure-to inform claim, it was concerned of its jurisdiction to hear any allegation that the VA failed to render appropriate medical services, or denied a veteran necessary medical treatment. *See Milbauer v United States.*, 636 F. App'x 556, 560 (11th Cir. 2016) (discussing *Thomas v. Principi*, 394 F.3d 970 (D.C. Cir. 2005)).

VJRA." )]. The Court also independently reviewed the supplemental evidence and caselaw provided by the Government in support of its argument for subject-matter jurisdiction, because parties cannot simply consent to subject-matter jurisdiction if it would otherwise be absent. *See Ins. Corp. of Ir. Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982) (discussing how "no action of the parties can confer subject-matter jurisdiction upon a federal court[]"). Satisfied with its findings, the Court moved forward with reviewing the Government's Motion for Summary Judgment.

And yet, despite assuring the Court that they believed that it had jurisdiction to rule on this matter, Plaintiffs inexplicably moved to transfer this action "to cure jurisdictional and venue defects" raised by the Court in its Order to Show Cause. [Doc. 34, p. 1]. Curiously enough, the Court does not know of any such defects that may exist related to the VJRA discussion raised in its Order. But, the Court considers such discussion, if relevant, in relation to the merits of Plaintiffs' Motion to Transfer.

## 2.    Merits of Plaintiffs' Motion to Transfer

Plaintiffs seek to have their case transferred to the United States District Court for the Northern District of Georgia. [Doc. 34]. The Government opposes this Motion. *See generally* [Doc. 37]. Upon review of Plaintiffs' two-page Motion to Transfer, the Court finds no citation to any legal authority for which their transfer arguments may be grounded. *See generally* [Doc. 34]. Nor does the Court find any citation to the record to suggest some factual basis that supports Plaintiffs' sudden interest in transferring this

case. *See generally* [*id.*]. Instead, Plaintiffs baldly assert that there are "jurisdictional and venue defects in the filing of the case in the Middle District[]" that warrant a transfer to the Northern District. [Doc. 34, p. 1]. In response, the Government first contends that "Plaintiffs do not explain what they mean by 'jurisdictional . . . defects.'" [Doc. 37, p. 2]. And the Court, upon review, similarly agrees. Plaintiffs provide no detail or explanation in support of their assertions, except to generally allege that such defects came to light upon reflection of the Court's Order to Show Cause. *See generally* [Doc. 34]. But any such alleged "jurisdictional . . . defects" have been addressed and resolved—to the extent there was a defect at all.[5]

The Court now addresses those alleged "venue defects" that warrant a transfer to the Northern District. Plaintiffs cite only the following reason as to why the Court should transfer this action:

> [w]hile it is true that part of the actions or inactions happened in the Middle District and part of the actions or inactions happened in the Northern District, on the failure to inform of the [s]tage 4 [c]ancer [d]iagnosis, the actual diagnosis occurred in Atlanta[,] Georgia at the Atlanta VA.

[Doc. 34, p. 1–2].

In their reason for transfer, Plaintiffs admit that the Middle District is an

---

[5] Furthermore, to be quite clear, if the Court did lack subject-matter jurisdiction pursuant to the VJRA, the appropriate remedy in such a case would not be for the Court to transfer this action to a different district court. *See* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."). The VJRA divests *all* federal district courts of subject-matter jurisdiction over veterans' benefits disputes—not just this particular district court. Therefore, to the extent that Plaintiffs' sudden interest in transferring this action arises "only to comply with the Court's issue of jurisdiction[,]" the Court must note that it has no such issue. [Doc. 38, pp. 1–2].

appropriate venue because "part of the actions or inactions" at issue in this suit

"happened in the Middle District[.]" [*Id.*]. And yet, Plaintiffs also argue they filed their

Motion to Transfer to "cure . . . venue defects in the filing of the case in the Middle

District." [*Id.*]. The actual Motion provides little to no detail as to what venue defects

exist. Indeed, Plaintiffs never attempt to base their argument on any legal authority

until the Government opposed their attempt to transfer the case. *Compare* [Doc. 34], *with*

[Doc. 38]. Regardless, the Court considers Plaintiffs' Motion under 28 U.S.C. § 1404(a)—

the statutory framework that grants district courts the authority to transfer venue.[6]

"For the convenience of parties and witnesses, in the interest of justice, a district

court may transfer any civil action to any other district or division where it might have

been brought[.]" 28 U.S.C. § 1404(a). Appropriately, "the purpose of the section is to

---

[6] The Court notes that Plaintiffs first cite 28 U.S.C. § 1406(a) as to why a transfer is appropriate in this action. [Doc. 38, p. 2]. This argument only arises in Plaintiffs' Reply [Doc. 38] to the Government's brief in opposition to their transfer motion. However, Plaintiffs' reliance on this statute is wholly misplaced, as it is used to transfer a case only when the case was initially filed in an improper venue. *See* 28 U.S.C. § 1406(a) ("The district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought."). "Section 1406(a) governs actions brought in an improper venue, and [Section] 1404(a) governs actions brought in an inconvenient venue." *Harris v. Lawson*, No. 7:08-CV-70 (HL), 2008 WL 2512131, at *1 (M.D. Ga. June 18, 2008) (citing *Roofing & Sheet Metal Servs., Inc. v. La Quinta Motor Inns, Inc.*, 689 F.2d 982, 992 n.16 (11th Cir. 1982). Accordingly, to transfer the case under § 1406(a), Plaintiffs would first need to show that the Middle District of Georgia is the wrong venue—something they cannot do. Plaintiffs filed this wrongful death action pursuant to the Federal Tort Claims Act. In that statute's venue provision, § 1402(b), a plaintiff alleging a claim under the FTCA may file the action "only in the judicial district where the plaintiff resides or wherein the act or omission complained of occurred." 28 U.S.C. § 1402(b). Jurisdiction in this Court is proper under *either* of these two circumstances because one of the plaintiffs resides in this district and some of the acts or omissions complained of occurred in this district. Therefore, because Plaintiffs originally filed their case in a proper district, they simply cannot rely on 28 U.S.C. § 1406(a) to transfer their case.

prevent the waste of time, energy and money and to protect litigants, witnesses and the public against unnecessary inconvenience and expense." *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964) (citation omitted). In light of this purpose, §1404(a) "is intended to place discretion in the district courts to adjudicate motions for transfer according to an individualized, case-by-case consideration of convenience and fairness." *Stewart Org., Inc. v. Rioch Corp.*, 487 U.S. 22, 29 (1988).

"The question of whether to transfer venue is a two-pronged inquiry." *Merswin v. Williams Cos.*, No. 1:08-CV-2177-TWT, 2009 WL 249340, at *5 (N.D. Ga. Jan. 30, 2009). The first inquiry under 28 U.S.C. 1404(a) is to determine whether the instant action could have been brought in the United States District Court for the Northern District of Georgia.[7] 28 U.S.C. § 1404; *Internap Corp. v. Noction Inc.*, 114 F. Supp. 3d 1336, 1339 (N.D. Ga. 2015).The second inquiry (at least in the Eleventh Circuit) involves consideration of the following nine distinct factors:

---

[7] As to this first inquiry, Plaintiffs failed to properly analyze in their Motion to Transfer whether this suit could have initially been filed in the Northern District of Georgia. When considering a transfer motion, a court must determine "whether the transferee court had subject matter jurisdiction and venue and whether the defendants were amenable to serve of process at the time the action was filed in the transferor court." *Martin v. S.C. Bank*, 811 F. Supp. 679, 683 (M.D. Ga. 1992). Plaintiffs offer no analysis on this point, so the Court can only assume that the basis for jurisdiction in the Northern District flows from their claim that "the actual [stage 4 cancer] diagnosis occurred in Atlanta[,] Georgia at the Atlanta VA." [Doc. 34, p. 2]. In response, the Government does not focus on the lack of analysis proffered on this first inquiry. Rather, the Government simply contends that "even if the case 'might have' originally been brought in the Northern District, transfer should still be denied under § 1404(a)." [Doc. 37, p. 5]. The Government then exclusively focuses on why, in consideration of two factors as to why the Court should deny Plaintiffs transfer motion: (1) the convenience to the parties and witnesses and (2) the interest of justice. [*Id.* at pp. 5–7]. In the interest of ruling on the arguments presented by the parties, the Court will simply note the failure on the part of Plaintiffs to address the first inquiry and will consider the arguments as to the second inquiry.

> (1) the convenience of the witnesses; (2) the location of relevant documents and the relative ease of access to sources of proof; (3) the convenience of the parties; (4) the locus of operative facts; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the relative means of the parties; (7) a forum's familiarity with the governing law; (8) the weight accorded a plaintiff's choice of forum; and (9) trial efficiency and the interests of justice, based on the totality of the circumstances.

*Manuel v. Convergys Corp.*, 430 F.3d 1132, 1135 n.1 (11th Cir. 2005). The moving party bears the burden of showing that transfer is appropriate in light of the aforementioned factors. *Martin*, 811 F. Supp. at 683. And to satisfy this burden, the movant must do more than show that "the transfer would merely shift inconvenience from one party to the other" or that "the balance of all factors is but slightly in [their] favor[.]" *Bell v. K Mart Corp.*, 848 F. Supp. 996, 998 (N.D. Ga. 1994).

Furthermore, in opposition to Plaintiffs' transfer motion, the Government cites the proposition that Plaintiffs, as the moving party, should demonstrate a change in circumstances warranting a change in venue, since they had the opportunity to choose the venue when filing the action. [Doc. 37, p. 3 (citing *Combs v. Fla. Dep't of Corr.*, 461 F. Supp. 3d 1203, 1214 (N.D. Fla. 2020))]. Accordingly, it is rather unusual that Plaintiffs initially chose this venue—the Middle District of Georgia—and only now, after the

close of discovery, seek a transfer.[8] Plaintiffs already had the opportunity to choose the venue best suited to their interests when initiating this action. To be exact, pursuant to the FTCA venue provisions, Plaintiffs had the option to bring this action either in the district where they resided, or where the act or omission complained of occurred. 28 U.S.C. § 1402(b). And, Plaintiffs chose the Middle District of Georgia to pursue this action—the district where: (1) at least "part of the actions or inactions" at issue occurred; (2) Mr. Knapik's Estate is located; and (3) Robin Lynn Knapik (a party in this suit) resides. [Doc. 1, ¶¶ 3, 4]; [Doc. 34, p. 1].

Second, and the Court cannot stress this enough, Plaintiffs failed to produce any legal argument or analysis to support its Motion to Transfer.[9] Instead, Plaintiffs waited until the Government filed its opposition brief to then respond with a filing that cites some legal authority. However, even in this subsequent filing, Plaintiffs fail to provide a

---

[8] The Government also cites *Combs v. Fla, Dep't of Corr.*, 461 F. Supp. 3d 1203, 1214 (N.D. Fla. 2020) for the proposition that Plaintiffs may be engaging in forum shopping because the basis for their motion, the fact that the stage 4 cancer diagnosis was made by the VA Medical Center in Atlanta, is not "newly discovered information." [Doc. 37, p. 4]. Rather, the Government contends that Plaintiffs knew of this fact prior to initiating this action based on information provided in Mr. Knapik's medical record. [*Id.* (citing Doc. 22-1, p. 2)]. The Court finds it unnecessary to examine allegations of forum shopping in detail, as the Court finds it sufficient to deny Plaintiffs' Motion To Transfer on the grounds that they failed to satisfy their burden in showing that a transfer was warranted under those considerations outlined by the Eleventh Circuit.

[9] Plaintiff's Motion to Transfer was so devoid of any legal argument, the Government essentially guessed which arguments Plaintiffs tried to raise and then refuted them. *See* [Doc. 37, pp. 5–6 ("To the extent Plaintiffs tacitly contend that any trial in the instant matter should occur in the Northern District because it would be more convenient to witnesses who were employees of the Atlanta VAMC, Plaintiffs' argument fails. For starters, . . . ")].

good reason for the Court to interfere with their initial decision to bring this action in

the Middle District.[10] Plaintiffs can only muster the single argument that the Northern

District would be a more appropriate venue because the Atlanta VA Medical Center

that diagnosed Mr. Knapik with stage 4 cancer is located there. [Doc. 34]. While it may

be true that the actual diagnosis occurred at the Atlanta VA Medical Center, Plaintiffs

have failed to satisfy their burden, as the moving party, to show why this fact

necessitates a transfer at this late stage in the proceedings. Plaintiffs properly initiated

this action in the Middle District and have provided no sufficient reason to move it,

especially at this late date. Accordingly, Plaintiffs' Motion to Transfer is **DENIED.**

### B.    Plaintiffs' Amended Complaint

On the same day that Plaintiffs filed their Motion to Transfer, they also filed an

---

[10] Plaintiff filed a Reply [Doc. 38] to Defendant's opposition brief, where, for the first time, they cited legal authority and caselaw in support of their Motion to Transfer. *See generally* [Doc. 38]. And, while Plaintiffs cited 28 U.S.C. § 1404(a) and the nine factors a court considers when determining whether transfer is proper, they offered no analysis as to why such factors weigh in their favor. [*Id.* at pp. 2–3] In fact, Plaintiffs simply listed all nine factors and cited the two they believed sufficient to warrant a transfer. [*Id.* at p. 3]. To be quite clear, neither of the two cited factors are the ones that courts consider to be the most important when analyzing whether a transfer should be granted. *See Elec. Transaction Network v. Katz*, 734 F. Supp. 492, 501–2 (N.D. Ga. 1989) ("The most important factor under § 1404(a) is the convenience of witnesses, and the moving party must make a specific showing of inconvenience to witnesses."). Plaintiffs make no such showing. In fact, they specifically state that "it may be no more convenient or inconvenient for the parties" to have this action transferred to the Northern District. [Doc. 38, p. 3]. Furthermore, the Government affirms that it accepted the burden of producing any witnesses from the Atlanta VA Medical Center necessary for trial. [Doc. 37, p. 6 ("Moreover, to the extent any current Atlanta VA federal employees are called to testify at a trial in this case, the United States will be responsible for producing those witnesses in the Middle District.")]. Therefore, at best, Plaintiffs are simply trying to transfer this action to an equally convenient forum, which is never enough under 28 U.S.C. § 1404(a). *Van Dusen v. Barrack*, 376 U.S. 612, 645–46 (1964) ("Section 1404(a) provides for transfer to a more convenient forum, not to a forum likely to prove equally convenient or inconvenient.").

Amended Complaint [Doc. 33]. To begin, a plaintiff may amend his complaint as a matter of right before the opposing party files a responsive pleading and no more than 21 days after initially filing his complaint. Fed. R. Civ. P. 15(a)(1). After such time, a plaintiff "may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). It appears that Plaintiffs' counsel failed to pursue either avenue before unilaterally filing the Amended Complaint.

In its original scheduling order, the parties proposed that the Court set November 2, 2019, as the latest date for a party to amend its pleadings. [Doc. 7, p. 6]. The Court adopted the parties' recommendations when it signed their proposed order. Thus, the parties unequivocally knew that the Court would not allow any amendments after November 2, 2019, without good cause. Here, Plaintiffs did not even bother to request the Court's permission before filing their Amended Complaint. And, in so doing, they violated the Court's order and the clear language of Federal Rule of Civil Procedure 15(a).

Accordingly, the Court finds Plaintiffs' Amended Complaint to be improper[11], and the Court **STRIKES** it.

---

[11] The Court must also note that Plaintiffs' Amended Complaint alleges a single count against the Government, wherein they allege five different legal theories, and merely incorporate all factual assertions contained in it. [Doc. 33, p. 7]. Thus, Plaintiffs' proposed Amended Complaint is a classic shotgun pleading that falls well short of the requirements found in Federal Rules of Civil Procedure 8(a) and 10. Because shotgun pleadings are by definition "futile" and because such defective pleadings could never pass the Court's review, relevant caselaw would have required the Court to reject Plaintiffs' Amended Complaint, even if they had asked the Court's permission to file it. *See Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313, 1321 n.11 (11th Cir. 2015) (citing cases).

## II.    SUBSTANTIVE MATTERS

Having dispensed with the preliminary procedural matters, the Court now turns its attention to the Government's Motion for Summary Judgment [Doc. 15]. As an initial matter, since this wrongful death action implicates sensitive medical records, the Court will be selective in its presentation of the undisputed facts. While some medical information must be discussed in detail, the Court also notes that the Government moved for summary judgment, contending that under Georgia law, a failure-to inform claim (as presented in this matter) constitutes a classic medical malpractice action; therefore, for Plaintiffs to have successfully asserted such a claim, they would have needed to produce expert testimony in support. *See generally* [Doc. 15]. The argument then follows that since Plaintiffs failed to produce any expert testimony, their claims fail as a matter of law and the Court should grant the Government's Motion for Summary Judgment. [*Id.*]. Appropriately, the facts presented will be limited to aiding the Court in its analysis of such an argument.

### A.    Factual Background

Mr. Knapik[12] served in the United States Navy, and because of his service, he was entitled to receive medical treatment through the Department of Veterans Affairs. [Doc.

---

[12] Throughout this Order, the Court refers to Charles Michael Knapik as "Mr. Knapik." However, one of the parties in this action is Mr. Knapik's son—Roderic Knapik. Since both men have the same last name, the Court refers to Roderic Knapik by his full name to avoid confusion.

15-2, ¶ 7]. For purposes of this Motion, the Court briefly reviews the medical services he received at the Dublin VA Medical Center and Atlanta VA Medical Center during the two months prior to his death.[13]

Mr. Knapik first showed symptoms of an underlying health issue on or about May 13, 2015, when his son, Roderic Knapik, noticed that his father "was constantly itching," appeared noticeably thinner, and slept on the floor at night rather than a bed because "he couldn't get comfortable." [*Id.* at ¶ 9]. As his son fortuitously noted, "something was not quite right." [*Id.*].

Mr. Knapik first sought medical treatment at the Dublin VA Medical Center on June 22, 2015, specifically complaining of abdominal pain. [*Id.* at ¶ 10]. The presiding medical physician, Dr. Abul Hasan, offered to perform a CT scan of Mr. Knapik's abdomen, but Mr. Knapik left prior to receiving one.[14] [*Id.*]. Mr. Knapik returned to the Dublin VA Medical Center on July 1, 2015, once again complaining of abdominal pain. [*Id.* at ¶ 11]. During this visit, medical staff ordered a "Stat CT scan" of his abdomen/pelvis. [*Id.* at ¶ 11]. Mr. Knapik left the medical center before a second

---

[13] Once again, the Court simply notes that it does not find it necessary to present an extensive overview of Mr. Knapik's sensitive medical records upon review of the grounds on which the Government moves for summary judgment. *See generally* [Doc. 15].

[14] In the interests of viewing these facts in the light most favorable to the nonmoving parties, i.e., Plaintiffs, the Court notes that the parties dispute exactly why Mr. Knapik left the medical center before receiving his CT scan. However, neither party disputes that a medical doctor offered to perform a CT scan, and no CT scan occurred. *Compare* [Doc. 15-2, ¶ 10] *with* [Doc. 25-1, ¶ 10].

treating physician, Dr. Kovac-Ferrara reviewed the results.[15] [*Id.*]. The CT report showed "subacute/chronic abnormalities . . . which will require further evaluation," and a "hilar abnormality concerning for malignancy." [*Id.*]. Based on these results, Dr. Kovac-Ferrara ordered subsequent medical tests. [*Id.*]. A medical record from the Dublin VA Medical Center notes that Mr. Knapik was contacted and notified of these results.[16] Then, on July 7, 2017, Mr. Knapik returned to the primary care unit for a follow-up consultation, but left prior to being seen. [*Id.* at ¶ 13].[17] Mr. Knapik returned to the medical center three days later and underwent a "whole body bone imaging scan." [*Id.* at ¶ 15]. The results showed:

> There is normal radiotracer distribution throughout the body. Both kidneys are visualized and are located in normal position. Focal increased uptake of radiotracer is noted at multiple sites which includes skull, multiple ribs, thoracolumbar spine and pelvis which suggest the possibility of bony metastasis. CT scan is recommended for further evaluation.

[*Id.*]. Then, on July 14, 2015, medical staff performed a CT scan with contrast of Mr.

---

[15] Again, the parties disagree why Mr. Knapik left the medical center before receiving the results of his test. *Compare* [Doc. 15-2, ¶ 11] *with* [Doc. 25-1, ¶ 11]. However, neither party disputes the actual results of the CT Scan or that Mr. Knapik did not receive notice of the results while he was at the medical center that day.

[16] Plaintiffs do not dispute that medical records state that Mr. Knapik was notified of his diagnosis and asked to follow-up in a week if he was not contacted by the medical center. Instead, Plaintiffs appear to dispute whether such contact/notification actually occurred. *See* [Doc. 25-1, ¶ 12 ( "Qualified in that ["Mr. Knapik] told his daughter everything about his health, did not know he was sick, and never mentioned such a call.")].

[17] As to this fact, it appears that Plaintiffs do not dispute that Mr. Knapik returned for a follow-up appointment on this date and left prior to being seen. *See* [Doc. 25-1, ¶ 13].

Knapik's thorax.[18] [*Id.* at ¶ 16].

After reading the results of that scan, medical staff then scheduled a PET scan for July 23, 2015 and referred Mr. Knapik to the pulmonary care unit for an evaluation of a lung mass. [*Id.* at ¶ 17]. However, after reviewing Mr. Knapik's prior test results, Dr. John Mathew rescheduled Mr. Knapik for an earlier appointment set for July 17, 2015. [*Id.* at ¶ 19]. At his pulmonary appointment, Dr. Mathew provided Mr. Knapik with the results of his bone imaging and thoracic CT scan, specifically noting that "the findings are very suspicious for lung cancer with metastasis." [*Id.* at ¶ 20]. Dr. Mathew also scheduled Mr. Knapik for a consultation at the Atlanta VA Medical Center for a bronchoscopy and EBUS procedure scheduled for July 30, 2015. [*Id.* at ¶ 21]. At this point during the medical testing, Roderic Knapik testified that he wished that his father could have undergone chemotherapy, but stated that "[he was] told . . . there couldn't be any treatment until they knew what they were treating. So until [he] had the results of the biopsy, there could be no treatment." [*Id.* at ¶ 22]; [Doc. 19, Roderic Knapik Depo., p. 53:9–15].

Mr. Knapik had a walk-in appointment with Dr. Kovacs-Ferrara on July 20, 2015, to review "in detail" with Mr. Knapik the results of his "recent imagining" tests. [Doc.

---

[18] In response to this fact, Plaintiffs respond with the following: "Qualified in that ["Mr. Knapik] told his daughter everything about his health, did not know he was sick, and never mentioned such a call." [Doc. 25-1, ¶ 16]. There is no mention in this fact of any call being made to Mr. Knapik, so the Court is unsure of what Plaintiffs mean by their statement. However, in the interest of presenting the facts in the light most favorable to Plaintiffs, the Court included their "qualification."

15-2, ¶ 24]. Three days later, Mr. Knapik obtained a PET scan at the Atlanta VA Medical Center. [*Id.* at ¶ 25].

Several doctors reviewed Mr. Knapik's medical records on August 3, 2015, with specific recommendation that he undergo an EBUS biopsy. [*Id.* at ¶ 28]. One professional, Dr. Riberio, from the Atlanta VA Medical Center's Hematology/Oncology unit, "noted that [the records] appeared [to show] small cell [carcinoma], and the EBUS [biopsy] would be adequate for [diagnosis.]" [*Id.*].

Then, two days later, Mr. Knapik returned to the Atlanta VA Medical Center to undergo a "Flexible Fiberoptic Bronchoscopy EBUS." [*Id.* at ¶ 31]. The next day, Mr. Knapik was transported by ambulance to the Houston Medical Center emergency room. [*Id.* at ¶ 33].

On August 7, 2015, Mr. Knapik's daughter, Robin Lynn Knapik, received a call from Nurse Patricia Swars at the Dublin VA Medical Center regarding a "follow up" about Mr. Knapik's medical treatment. [*Id.* at ¶ 34]. And, during this call, Robin Lynn Knapik informed her that her father had been admitted to a local hospital the prior night. [*Id.*]. On the same day, Mr. Knapik's treating physician at Houston Medical Center noted that he had examined Mr. Knapik, and was awaiting "the results of the biopsy [from the Atlanta VA Medical Center on August 5, 2015] to determine which chemotherapy to use." [*Id.* at ¶ 35].

The medical records note that a pulmonary resident from the Atlanta VA

Medical Center called Ms. Knapik and conveyed to her Mr. Knapik's "diagnosis of extensive stage small cell carcinoma." [*Id.* at ¶ 36].  Dr. Al-Hajj, a treating physician from the Houston Medical Center, noted that he "went over the prognosis with the patient and his family. [*Id.* at ¶ 38]. The doctor had informed Mr. Knapik that life expectancy without any chemotherapy would be about 2 to 4 weeks, and that with chemotherapy, it could "be extended to 3 months or a year or even more." [*Id.*]. Two days later, Mr. Knapik began a three-day round of chemotherapy treatment at Houston Medical Center. [*Id.* at ¶ 39]. He died 12 days later on August 25, 2015. [*Id.* at ¶ 41].

Almost exactly two years after Mr. Knapik's death, his Estate timely submitted a Standard Form 95 to the Department of Veterans Affairs, claiming that "[Mr. Knapik] died from [s]tage 4 [c]ancer. [Doc. 15-3]. Also, the claim alleged that [the] VA failed to properly diagnose cancer even though [Mr. Knapik] presented with severe abdominal pain and weight loss 2 months prior, and multiple x[-]rays prior to PET [s]can and biopsy revealed [s]tage 4 [c]ancer in multiple areas, and mother died of melanoma." [*Id.*]. On November 19, 2018, the VA denied the claim. [Doc. 15-4].[19] Subsequently, Plaintiffs filed this wrongful death action against the United States, through its agency,

---

[19] "A plaintiff bringing a claim against the United States under the FTCA must first present the claim to the appropriate federal agency and wait for the agency to finally deny it." *Burchfield v. United States*, 168 F.3d 1252, 1254 (11th Cir. 1999). Accordingly, this means that a plaintiff must do two things: "(1) give [the appropriate] agency written notice of his or her claim sufficient to enable the agency to investigate and (2) place [ ] a value on his or her claim." *Id.* (quoting *Adams v. United States*, 615 F.2d 284, 289 (5th Cir. 1980), *decision clarified on denial of reh'g*, 622 F.2d 197 (5th Cir. 1980).

the Department of Veterans Affairs, under the FTCA which allows plaintiffs to seek

damages from the United States[20] for certain torts committed by federal employees. 28

U.S.C. § 1346(b); 28 U.S.C. § 2674. Specifically, Plaintiffs allege that "the United States

Department of Veterans Affairs Doctors and Medical Staff fail[ed] to inform [Mr.

Knapik] of a [s]tage 4 [l]ung [c]ancer [d]iagnosis," which wrongfully caused his death.[21]

[Doc. 1, p. 1]. As a result of the medical staff's alleged failure to inform Mr. Knapik of

his lung cancer, Mr. Knapik "suffered needlessly" and "missed out on two months of

his life[,]" as well as the opportunity "to have aggressive chemotherapy to prolong his

life." [*Id.* at ¶¶ 13–15].

## B.    Summary Judgment Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a). A factual dispute is not genuine unless, based on the

---

[20] "It is well settled that sovereign immunity bars suit against the United States except to the extent that it consents to be sued. *Means v. United States*, 176 F.3d 1376, 1378 (11th Cir. 1999). However, Congress authorized a limited waiver of this immunity for those actions arising under the Federal Tort Claims Act (the "FTCA"). *Id.* An individual may bring suit against the United States

> for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346 (b)(1).

[21] It is important to note that "Plaintiff[s] have never contended that the VA caused [Mr. Knapik's] cancer," only that "the VA did have a duty to tell [Mr. Knapik] of his diagnosis in a timely manner." [Doc. 39, p. 4 (citing Plaintiffs' Responses to USA's First Interrogatories, Interrogatory No. 4)].

evidence presented, "'a reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The movant "bears the initial burden of informing the district court of the basis for its motion[] and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); Fed. R. Civ. P. 56(c)(1)(1).[22] "When the nonmoving party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material negating the opponent's claim[]' in order to discharge this 'initial responsibility.'" *Four Parcels*, 941 F.2d at 1437–38 (quoting *Celotex*, 477 U.S. at 323). Rather, "the moving party simply may show—that is, point out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* (quoting *Celotex*, 477 U.S. at 324). Alternatively, the movant may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Id.*

If this initial burden is satisfied, the burden then shifts to the nonmoving party,

---

[22] Courts may consider all materials in the record, not just those cited by the parties. Fed. R. Civ. P. 56(c).

who must rebut the movant's showing "by producing . . . relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (citing *Celotex Corp.*, 477 U.S. at 324). The nonmoving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable or [] is not significantly probative' of a disputed fact." *Id.* (quoting *Anderson*, 477 U.S. at 249–50). "A mere scintilla of evidence supporting the [nonmoving] party's position will not suffice." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). Further, where a party fails to address another party's assertion of fact as required by Federal Rule of Civil Procedure 56(c), the Court may consider the fact undisputed for purposes of the motion. Fed. R. Civ. P. 56(e)(2).

## C.    Discussion

Ultimately, the Court must decide whether this action is one for ordinary negligence or professional negligence (medical malpractice). Both parties agree that the factual basis underlying all claims in this matter center on the alleged failure on the part of the doctors and medical staff at the Atlanta VA Medical Center and Dublin VA Medical Center to inform Mr. Knapik of his cancer diagnosis in a timely manner. Disagreement between the parties arises over whether a failure-to-inform claim constitutes professional negligence or ordinary negligence. *See* [Doc. 15]; [Doc. 25];

[Doc. 29].[23] Since Plaintiffs bring this action under the FTCA, the Court applies the law of the state where the act or omission at issue occurred. *Ochran v. United States*, 273 F.3d 1315, 1317 (11th Cir. 2001) (quoting 28 U.S.C. § 1346(b)(1)). Since the alleged acts and/or omissions underlying this action occurred in Georgia at the Dublin VA Medical Center and Atlanta VA Medical Center, the Court applies Georgia law as to the ultimate issue of how to best characterize a failure-to-inform claim.

Under Georgia law, "[t]he confidential relationship between doctor and patient creates a duty to inform the patient of his or her condition." *Oliver v. Sutton*, 540 S.E.2d 645, 648 (Ga. Ct. App. 2000) (quoting *Hendrix v. Schrecengost*, 358 S.E.2d 486, 487 (Ga. Ct. App. 1987)). As a result, "a lawsuit premised upon a breach of this duty is a classic medical malpractice action." *Piedmont Hosp., Inc., v. D.M.*, 779 S.E.2d 36, 39 (Ga. Ct. App. 2015) (quoting *In re Carter*, 653 S.E.2d 860, 869 (Ga. Ct. App. 2007). While Plaintiffs allege various theories of liability in this action —"negligence," "personal injury," "medical malpractice," "omission," and "wrongful death"— the crux of all these claims concern whether medical doctors and staff failed to timely inform Mr. Knapik of his cancer diagnosis. Therefore, to the extent that Plaintiffs attempt to classify this action as anything but one implicating medical malpractice (professional negligence), they

---

[23] The Government contends that under Georgia law, a failure-to inform presents a classic medical malpractice action, and a plaintiff bringing such a claim must provide expert testimony in support. [Doc. 15]. Plaintiffs, in turn refute the notion that this action implicates professional negligence, categorizing "[t]his action [as] a wrongful death and negligence action." [Doc. 25 at p. 2]. Therefore, Plaintiffs are adamant that expert testimony is not necessary in such an action. [*Id.* at p. 4–5, 7–8].

overlook the controlling caselaw that prevents them from pursuing an ordinary

negligence theory on the facts as presented.[24]

This case does not cease being one for professional negligence (medical

malpractice) simply because Plaintiffs belatedly attempt to label it as one for ordinary

negligence. "Although complaints against professionals may state claims based on

ordinary as well as professional negligence, the complaint's characterization of claims

as stating professional or ordinary negligence does not control." *Bardo v. Liss*, 614 S.E.2d

101, 104 (Ga. Ct. App. 2005) (emphasis added) (citing *Shirley v. Hosp Auth. of Valdosta*

*Lowndes Cnty.*, 587 S.E.2d 873 (Ga. Ct. App. 2003) *overruled on other grounds by Chandler v.*

*Opensided MRI of Atlanta, LLC.*, 682 S.E.2d 165 (Ga. Ct. App. 2009).  Rather, "[a court]

must look to the substance of an action against a medical professional, hospital, or

health care facility in determining whether the action is one for professional or

---

[24] Furthermore, Plaintiffs quite clearly allege medical malpractice as a theory of liability in their Complaint. [Doc. 1, p. 1]. Therefore, to the extent that Plaintiffs allege that this case does not involve medical malpractice, the Court need only to refer them to their own words. And yet, confusingly, Plaintiffs attempt to abandon their reliance on this theory in their Response to Defendant's Motion for Summary Judgment. [Doc. 25, p. 2 ("This action is a wrongful death and negligence action[;]" . . . "[t]he claim for wrongful death does not requires the services of an expert. Wrongful death and medical malpractice are different cases with distinctions. Wrongful death cases do not require the services of an expert.")]. Based upon this distinction, the Court, in its Show Cause Order, noted that it appeared that Plaintiffs abandoned their intent to move forward with their medical malpractice claims. [Doc. 30, p. 6]. Simply because this singular claim is no longer relevant, the Court is not absolved of its obligation to consider whether Plaintiffs' additional claims, delineated as ordinary negligence, may also raise medical malpractice concerns.

[ordinary] negligence."[25] *Moore v. Louis Smith Mem'l Hosp. Inc.*, 454 S.E.2d 190, 192 (Ga. Ct. App. 1995). Several Georgia cases, cited by the Government in its Motion for Summary Judgment, share similar facts to the ones presented here and  help guide the Court in reaching its ultimate determination that Plaintiffs' claims are ones for medical malpractice.

For example, *In re Carter*, 653 S.E.2d 860 (Ga. Ct. App. 2007), a mother brought suit against a medical college and its physicians for failing to inform her of her child's diagnosis for sickle cell anemia. The mother alleged that although the physicians knew of the diagnosis at his birth, they failed to notify her of the child's positive test results for the disease, and as a result, they simply "slipped through the cracks[.]"[26] *Id.* at 863. Upon receiving no notification of the illness, the child never received treatment and allegedly suffered a debilitating stroke as a complication from the disease. *Id.* at 864. The mother brought suit under a Georgia statute requiring medical facilities to notify parents when a child tested positive for with sickle cell anemia. *Id.* at 863. However, the Court held that the treating physicians could not be liable under the statute because a claim based upon a failure to inform arises from a doctor's common law duty to inform

---

[25] The Court notes that it did not reach its conclusion that this action is one for medical malpractice action simply because the alleged injury occurred at a medical center and the relevant facts heavily feature medical doctors and staff.

[26] In their Response to Defendant's Motion for Summary Judgment, Plaintiffs made a similar argument in support of their negligence claim. *See* [Doc. 25, p. 6 ("According to Roderic Knapik his father was just a number who fell through the cracks . . . .")].

a patient of a medical diagnosis, and most importantly, "is a classic medical malpractice action." *Id.* at 870. Therefore, the mother should have sought recovery pursuant to a medical malpractice theory of liability. *Id.*. But, the Georgia Court of Appeals noted that she was barred from bringing forward such a theory in that action because she failed to file the requisite expert medical affidavit in support of her claim. *Id.* Therefore, even though the mother tried to frame her failure-to-inform claim, not as one for medical malpractice, but one for a breach of a statute, the Georgia Court of Appeals nonetheless found the claim to be a medical malpractice claim under Georgia law.

Under similar circumstances, in *Piedmont Hosp., Inc., v. D.M.*, 779 S.E.2d 36 (Ga. Ct. App. 2015), the plaintiff brought suit against a hospital and his treating physician under various theories of negligence for failing to inform him of his positive HIV-status when the physician first learned of it. *Id.* at 37–38. The plaintiff alleged that medical staff received tests results confirming his diagnosis, and they did not call him to inform him of his diagnosis or schedule a follow-up appointment. *Id.* at 38. While the plaintiff characterized his claim as "ordinary negligence," the Georgia Court of Appeals noted that such characterization did not control its analysis when the substance of the claim alleged professional negligence. *Id.* at 39. Since the crux of all claims in that action arose from an alleged duty to inform a patient of his or her medical condition, the Georgia Court of Appeals determined the action to be one for medical malpractice. *Id.* at 40–41.

While the Court could continue detailing Georgia cases that affirm the proposition that a failure-to-inform claim constitutes a medical malpractice action, the point has clearly been made.[27] Now, having categorized Plaintiffs' claims as one for professional negligence (medical malpractice), the Court explains why such a task was necessary. Under Georgia law, a plaintiff seeking to recover in a medical malpractice action, must prove: "(1) the duty inherent in the doctor-patient relationship; (2) the breach of that duty by failing to exercise the requisite degree of skill and care; and (3) that this failure [was] the proximate cause of the injury sustained." *Zwiren v. Thompson*, 578 S.E.2d 862, 864 (Ga. 2003) (quoting *Hawkins v. Greenberg*, 304 S.E.2d 922 (Ga. Ct. App. 1983). In such cases, Georgia law presumes that "medical services were performed

---

[27] Plaintiffs attempt to distinguish the need for expert medical testimony in this action by averring that a wrongful death action does not require such expert testimony. [Doc. 25, p. 2]. And, the Court no doubt expects this statement to be true—in some cases. However, it is not true in this case. Plaintiffs' wrongful death action arises from the Government's failure to inform/notify Mr. Knapik of his stage 4 cancer diagnosis, "even though the VA] knew of the ominous and foreboding results of the deadly [s]tage 4 [c]ancer diagnosis reports weeks earlier." [Doc. 1, ¶ 12]. Their wrongful death claim is still premised on medical malpractice. And when this occurs, "there can be no recovery in a wrongful death action based on medical negligence where there is no showing to any reasonable degree of medical certainty that the patient's death could have been avoided." *Dowling v. Lopez*, 440 S.E.2d 205, 208 (Ga. Ct. App. 1993). So, Plaintiffs would still need to have produced evidence that the VA's alleged failure to inform Mr. Knapik of his cancer diagnosis was the proximate cause of the injuries suffered. *Id.* at 209. To understand (or better yet to ultimately resolve) whether an earlier diagnosis could have provided Mr. Knapik with a longer lifespan, requires a comprehensive understanding of (1) how medical staff initially, and over time, diagnose and treat stage 4 cancer; (2) how stage 4 cancer develops and progresses in a 72-year-old man with similar, if not at least comparable, attributes to Mr. Knapik; and (3) whether it is possible to trace back Mr. Knapik's cancer to determine whether aggressive chemotherapy could have allowed him more time, and what that time looked like. Because of questions like these, proximate cause, in actions premised upon medical malpractice, must be established by expert testimony. *Swint v. Mae*, 798 S.E.2d 23, 25 (Ga. Ct. App. 2018) ("Causation is established through expert testimony because the question of whether the alleged professional negligence caused the plaintiff's injury is one for specialized expert knowledge.") (citations and quotations omitted). Plaintiffs have not produced any evidence of expert testimony, or even cited an expert they intend to call during trial. Therefore, any separate claim for wrongful death, premised on a failure-to-inform, similarly fails for want of evidence.

in an ordinary and skillful manner[.]" *Overstreet v. Nickelsen*, 317 S.E.2d 583, 587 (Ga. Ct. App. 1984). "The proof required to rebut that presumption must come from expert medical witnesses." *Id.* Thus, in a medical malpractice action, medical expert testimony is not merely a suggestion to prove the causation prong, it is a requirement. *Zwiren*, 578 S.E.2d at 866; *see Bowling v. Foster*, 562 S.E.2d 776, 780 (Ga. Ct. App. 2002) (A "plaintiff is usually required to 'offer expert medical testimony to the effect that the defendant-doctor failed to exercise that degree of care and skill which would ordinarily have been employed by the medical profession generally *under the circumstances*.'") (citation omitted; emphasis added); *Porter v. Guill*, 681 S.E.2d 230, 235 (Ga. Ct. App. 2009) ("To recover in a medical malpractice case, a plaintiff must demonstrate, by expert testimony, a violation of the applicable medical standard of care [and] also that the purported violation [of] or deviation from the proper standard of care is the proximate cause of the injury sustained."). The reason why expert testimony is necessary in a medical malpractice action, and not in an ordinary negligence action can be summarized as follows:

> A malpractice claim requires expert testimony because the court and the jury must have a standard measure which they are to use in measuring the acts of the professional in determining whether he exercised a reasonable degree of care and skill in caring out his professional duties. The proper standard of measurement is to be established by testimony of professionals; for it is a professional question.

*Roberts v. Quick Rx Drugs, Inc.*, 807 S.E.2d 476, 480 (Ga. Ct. App. 2017) (quoting

*Hopkinson v. Labovitz,*[28] 499 S.E.2d 338, 339 (Ga. Ct. App. 1998)); *see Wagner v. Timms*, 281

S.E.2d 295, 297 (Ga. Ct. App. 1981) ("Testimony establishing the proper medical

standard [is] required because a jury cannot reasonably be expected to apply negligence

principles to medical conduct absent competent evidence of what degree of skill and

care the medical profession generally would have exercised under similar

circumstances."). Accordingly, a plaintiff alleging professional malpractice must present

expert testimony to establish the proper medical standard of conduct.[29]

Upon applying the relevant framework, the question as to whether Plaintiffs

provided sufficient evidence in support of their claims is relatively short. First, Plaintiffs

fail to cite to any evidence in the record that shows a medical provider employed by the

VA failed to conform to an appropriate standard of care. They simply can't because

they failed to produce any evidence establishing the appropriate standard of care used

when informing a 72-year-old patient about his stage 4 cancer diagnosis. They also

---

[28] The Court notes that this action involved a professional malpractice suit against an *attorney*, not a medical professional. However, its application is still relevant here, especially given that the affidavit requirements in O.C.G.A. 9-11-9.1 apply whenever professional malpractice is alleged.

[29] Furthermore, "in addition to those requirements, Georgia law also requires medical-malpractice plaintiffs to submit an affidavit from a competent expert, "set[ting] forth specifically at least one negligent act or omission claimed to exist and the factual basis for each such claim." O.C.G.A. § 9-11-9.1(a); *see also Mansfield v. United States*, CV419-168, 2020 WL 1130860, at*3 (S.D. Ga. Mar. 6, 2020) (citing O.C.G.A. § 9-11-9.1(a)) ("[I]n any action for damages alleging professional malpractice[] . . . the plaintiff shall be required to file with the complaint an affidavit of an affidavit of an expert competent to testify, which affidavit shall set forth specifically at least one negligent act or omission claimed to exist and the factual basis for each such claim.").

failed to identify the medical employees who allegedly breached such a duty, and whether such a breach was the proximate cause of the injury sustained—Mr. Knapik's premature death.[30] Plaintiffs cannot establish a single element of a prima facie case for medical malpractice, let alone the requisite three. While there is a myriad of paths available by which a plaintiff may choose to successfully present his case, a plaintiff can never win without evidence. *See* McCollough v. Atlanta Beverage Co., 929 F. Supp. 1489, 1495 (N.D. Ga. 1996) ("Thus, to survive a motion for summary judgment, the nonmoving party must come forward with specific evidence for every element material to that party's case so as to create a genuine issue for trial."). Simply put, no evidence means no case. Here, Plaintiffs have no evidence.

Accordingly, Plaintiffs' failure to provide a medical expert on any issue related to their allegation that the VA's alleged failure to inform Mr. Knapik of his diagnosis caused his premature death dooms such claims. Without such evidence, Plaintiffs present no triable issue as to whether the Government can be held liable for Mr. Knapik's premature death or pain and suffering.

## II.   <u>CONCLUSION</u>

Based on all of the foregoing reasoning, the Court Denies Plaintiff's Motion to

---

[30] Plaintiffs specifically allege that the VA medical centers staff failed to inform Mr. Knapik of his diagnosis, which prevented him from receiving "aggressive chemotherapy to prolong his life." [Doc. 1, ¶ 15].

Transfer [Doc. 34] and **GRANTS** Defendant's Motion for Summary Judgment [Doc. 15]

AS a result, the Court **DIRECTS** the Clerk of Court to enter Judgment accordingly and

**CLOSE** this case.

      **SO ORDERED**, this 29th day of December, 2020.

S/ Tilman E. Self, III               
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**
